## Maguire Estate

*Vincent C. Veldorale,* for accountants.

*James E. Gallagher, Jr., Harry Feinstein, John F. Thaete, Walter B. Gibbons* and *E. Louis Rosen,* for claimants.

*Alfred D. Whitman,* for Commonwealth.

LEFEVER, J., November 15, 1961.—Sara C. Maguire died March 15, 1959. She was a spinster. Her closest relatives were a brother and several nephews and nieces.

A printed form of will, allegedly signed by testatrix and two subscribing witnesses, together with two unattached, unsigned handwritten papers, were *all* probated on May 8, 1959, in the office of the register of wills as the last will and testament of decedent, although the probate record does not contain a "Copy Fair" of the will. Contemporaneous therewith, letters testamentary were granted to James C. McConville and Theresa C. McConville, named executor and executrix, respectively, in the printed form of will.

A first and final account was filed by the executors and called before the undersigned for audit on May 2, 1960, and October 5, 1960.

The statement of proposed distribution filed by the accountants stated that the beneficiaries of the estate were: "Michael J. Maguire, Sr.—brother—life estate," and five Catholic charities, "residuary legatees." Therein, accountants requested that "the balance for distribution . . . be awarded to James C. McConville and Theresa C. McConville, as trustees under the will of the decedent." The account shows a balance for distribution of $25,886.45, consisting of common stocks, cash and decedent's homestead, premises 1524 Porter Street, Philadelphia, valued at $6,000.

At the audit, the auditing judge, sua sponte, raised the question as to whether or not the documents probated constituted a will. As hereinbefore stated, there is no clear evidence that the decree of probate was entered in accordance with "Copy Fair" of the will probated by the register. In light of this fact, the auditing judge, not without misgivings as to the propriety thereof at this stage of the proceedings, permitted the

introduction of evidence with regard to the execution of the alleged will.

James C. McConville, the scrivener, his wife, Theresa, and the subscribing witnesses, Jane A. Harrold and Mary DeCaux, testified with regard to the execution of the so-called will. Michael J. Maguire also testified. The pertinent facts follow.

Decedent and her brother, Michael, lived together in her homestead. She ". . . didn't believe in doctors and lawyers. . . ." For almost a year prior to February 1959, she had been talking to her neighbor and close friend, Theresa C. McConville, about writing a will. She repeatedly stated that she wanted Mr. McConville to write it. Mrs. McConville communicated this to her husband, and he consistently refused to write the will on the ground that he was not trained to do so.

Despite ill health, decedent refused to consult a physician. On February 12, 1959, decedent became quite ill. She finally agreed to see a doctor, and her brother made an appointment with a physician to call upon her at the house upon the following day. In this exigency, she insisted that Mrs. McConville immediately bring her husband to her home to write her will. Mr. McConville reluctantly acceded to decedent's request.

Mr. McConville testified that when he arrived at her home, Miss Maguire handed him a will form which she stated her brother, Michael, had purchased through the mail from a lawyer in Miami, Fla. She then told Mr. McConville what she wished to provide in her will. There was not sufficient room to write her wishes in the blanks contained in the form. Therefore, he wrote them on two separate pages of yellow ruled paper. He then read to her what he had written. Decedent stated that this was what she wanted. Thereupon, he inserted in paragraph D of the will form "James C. McConville, Executor, and Theresa C. McConville, Execu-

trix," and filled in the date, February 12, 1959, at the appropriate space. No reference to the handwritten pages was made in the form. He then instructed decedent to sign at the designated place on the form. Decedent signed a shaky, almost unrecognizable signature. Thereafter, at his instruction, Jane A. Harrold and Mary DeCaux signed as witnesses. However, decedent and the witnesses did not place their signatures upon the separate handwritten pages. Mr. McConville then handed the will form and the two handwritten pages to decedent. They were not clipped together or otherwise attached to each other. He does not know what decedent did with them. He next saw them *after* decedent's death when they were handed to him by the brother, Michael, "folded three ways." The scrivener did not recall whether or not they were in an envelope; in any event, no envelope was produced in court.

Mrs. McConville corroborated this testimony in main. However, both subscribing witnesses were very vague as to what transpired at the alleged execution of the will. Jane A. Harrold didn't "recall" whether or not she saw decedent sign. Mary DeCaux was completely confused in her testimony. Finally, after counsel pleaded surprise and cross-examined her, and the court addressed further questions to her, she testified that the alleged will was written by the scrivener, read to decedent, signed by decedent, and then signed by Miss Harrold and Mary DeCaux, as witnesses.

Michael J. Maguire testified that he obtained the will form from a lawyer in Miami, Fla., about 1956 for $1 which he sent in answer to an advertisement in the newspaper. *He* gave this form to Mr. McConville to write decedent's will. He was *not* present at the execution of the will. He saw the so-called will on only one occasion sometime afterwards. He did not know exactly where Mrs. McConville found the will after

decedent's death. However, she discovered it while he and she were searching through decedent's trunk and closet for the cemetery deed following decedent's death.

The register of wills probated all three pages as the alleged will. The photostatic copies of the alleged will, attached to the letters testamentary, show the will form as page 1 and the two unsigned handwritten pages as unnumbered pages 2 and 3. There is nothing in the letters testamentary or in the register's record to show what constituted the will. The register failed to make a "Copy Fair."

It is clear from the evidence adduced that decedent intended to write a will in which she gave to her brother Michael a life estate in her homestead, 1524 Porter Street, Philadelphia, together with the income for life, and possibly the principal, of a trust of the residue of her estate, and at his death the remainder to the five Catholic charities. Therefore, the first requisite of a valid will was present, namely, testamentary intention.

Evidence was produced that decedent signed the will form. Even though the dispositive provisions are in blank, the document appointed executors and also named them as trustees with trust powers. The will form is dated. The document is signed at the end thereof. It appears to have been witnessed by two subscribing witnesses. Their weak testimony adds further doubt to this vague case. However, there is evidence from which the register might find valid execution of the document. If so, the executed will form constitutes a valid will.

The crucial question is whether or not the two pages handwritten by Mr. McConville, unsigned by testatrix, constitutes a part of the will. There is grave doubt about this because: (1) These two pages were not signed at the end thereof, or in any other place, by decedent; (2) they were not physically attached to the

document signed by decedent; (3) there is no internal sequence between these two pages and the will form; (4) the will form does not contain any language incorporating these two pages by reference; (5) there is no proof as to the order in which they were kept by decedent; (6) these two pages were written partly in the first person and partly in the third person, e.g. "her brother," "it is the desire of Sara C. Maguire," "Sara C. Maguire states that after the death of her brother, Michael," "Sara C. Maguire requests that the two rings . . ." This use of the third person, the use of expressions such as "desire," "wish," "arrange a trust fund of my estate," and other language make it appear that these two pages contain instructions for the writing of a will rather than constituting a will themselves. The scrivener partially confirmed this when he testified "I was hoping she would get well enough to see a lawyer . . ." And his wife testified: "We were under the impression that she was going to get better and she could fix it the way she wanted to fix it later on."

The foregoing are merely observations, for at this point it is not for this court to determine what, if anything, constitutes decedent's will.

Probate of a will initially is solely within the jurisdiction of the register of wills. This court obtains jurisdiction over the probate of a will on appeal only. No appeal was taken from the decree of probate within the statutory period of two years allowed for appeals.

Does this court have power now to raise this question? This was answered in the affirmative in Rockett Will, 348 Pa. 445, where the Supreme Court affirmed the decision of this court to that effect, stating at pages 448, et seq.:

"In this Commonwealth the line of demarcation between matters of probate and of distribution or construction is distinct and definite. In this connection

it was said by this Court, in Carson's Estate, 241 Pa. 117, 121, 88 A. 311: 'The probate of a will without regard to its provisions is one thing; distribution of the estate of the testator in accordance with its terms is another. *The former is for the register; the latter is none of his concern.*' It is clear that the issue here, i.e. whether or not clause (a) formed a part of testator's will, is one of probate, rather than of construction or distribution. In Hegarty's Appeal, 75 Pa. 503, it was said by Mr. Justice SHARSWOOD (pp. 514-515): . . . 'We may assume that where the contest is, whether a particular clause really forms a part of the will of the testator . . . it is in the power of the register to grant probate of the rest of the paper without such clause as forming in truth no part of the will.' cf. Dixon's Appeal, 55 Pa. 424; Seiter's Estate, 265 Pa. 202, 108 A. 614; Baker's Estate, 331 Pa. 33, 200 A. 65; Rosenthal's Estate, 339 Pa. 489, 15 A. 2d 370; Davis' Estate, 344 Pa. 520, 26 A. 2d 339.

"The Register of Wills Act of June 7, 1917, P. L. 415, §16 (a), provides: 'The probate, or refusal of probate, by the register of the proper county of any will, or any other paper purporting to be a will or codicil thereto shall be conclusive . . . unless, within two years from the date of such probate or refusal of probate, those interested shall appeal from the decree of the register as herein provided . . .' While we are satisfied that this provision of the statute should be strictly upheld (Taylor's Estate, 306 Pa. 7, 158 A. 275), yet the circumstances here presented prevent its application. Although it appears from the affidavit of the attesting witnesses that the marginal notations apparently were not on the will at the time of its execution, the decree of probate, nevertheless, fails to state whether or not they are part of the will with which we are here concerned. The silence of the decree

in this connection makes it capable of a double interpretation, either that the clause was or was not revoked, and thus a proper distribution could not be made at the audit . . . Therefore, in the instant case, in view of the Register's failure to determine whether all or merely a part of the instrument offered for probate was in fact the will of testator, it is obvious that *the court below had no alternative but to declare the decree of probate void and refuse to audit the account until an intelligible and unequivocal decree is made by the Register.*" (Italics supplied.) See also Wright Estate, 380 Pa. 105.

It is impossible for the auditing judge to direct distribution in the instant estate until the register of wills probates a "Copy Fair." The auditing judge is fortified in this conclusion by the frank statement of counsel for the charities at the audit: "I feel that it is very questionable whether these things can be incorporated, particularly in view of the second longhand page which appears to be a recitation of what testatrix desired." Moreover, the Commonwealth lodged an objection to these two pages being construed as part of the will. It follows that the auditing judge must now refer this matter back to the register for further probate with the direction that, after giving notice to all interested parties including those who would be heirs at law under the Intestate Act, he determine whether or not the two handwritten pages constitute a part of the will, and then make a "Copy Fair" of the will and probate the same. When this has been done, any aggrieved party will have the statutory right of appeal to this court. When this course of action has been completed, it will be in order to request a further audit of the account.

This adjudication has been so long delayed because of the earnest, protracted, but unsuccessful efforts of

668

counsel to effect a family settlement agreement among the beneficiaries under the alleged will and the persons who would be entitled under the Intestate Act, if there is an intestacy under the will as probated.

Accordingly, the auditing judge enters the following decree:

And now, to wit, November 15, 1961, for the reasons hereinabove set forth, the decree of probate is vacated; confirmation of the account is refused until a proper decree of probate is entered; the account is returned to the clerk's office marked "Not Audited"; and the accountants are directed to make application to the register of wills for an appropriate decree of probate in accordance with "Copy Fair", after appropriate proceedings enable him to determine what paper writing or writings constitute the last will and testament of the decedent.